# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE<br>1130 17th Street, NW<br>Washington, DC 20036 | )<br>)<br>)<br>) |
| CENTER FOR BIOLOGICAL DIVERSITY<br>P.O. Box 710<br>Tucson, AZ 85702-0710 | )  Case No.<br>)<br>) |
| Plaintiffs, | )  **COMPLAINT FOR**<br>)  **DECLARATORY AND**<br>)  **INJUNCTIVE RELIEF** |
| vs. | )<br>) |
| SALLY JEWELL,<br>Secretary, U.S. Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 | )<br>)<br>)<br>)<br>) |
| DANIEL M. ASHE,<br>Director, U.S. Fish and Wildlife Service<br>1849 C Street, NW<br>Washington, DC 20240 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

## INTRODUCTION

1.      This case challenges the decision of the U.S. Department of the Interior ("DOI") and the U.S. Fish and Wildlife Service ("Service") to withdraw a proposal to list the dunes sagebrush lizard (*Sceloporus arenicolus*) as an endangered species pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq. See* Withdrawal of the Proposed Rule to List Dunes Sagebrush Lizard, 77 Fed. Reg. 36,872 (June 19, 2012).

2.      The dunes sagebrush lizard is a small brown lizard that buries itself in sand to avoid predators and regulate its body temperature. Considered one of the nation's most imperiled lizards, it has a very small and increasingly fragmented range in

southeastern New Mexico and west Texas, where it is threatened by ongoing oil and gas drilling and herbicide spraying for livestock grazing.

3.      The lizard has been a candidate for listing under the ESA since 1982. It has spent more than thirty years in regulatory limbo, warranted for federal protection but denied listing under the ESA due to other agency priorities.

4.      In 2010, the Service proposed to list the lizard as an endangered species but withdrew the proposal 18 months later on June 12, 2012, based in significant part on a new voluntary conservation agreement developed with the State of Texas. New Mexico had previously developed a conservation agreement to conserve the lizard.

5.      The Texas agreement, however, only vaguely describes the conservation actions required of participants, leaving concrete conservation measures to be spelled out in "certificates"—specific agreements negotiated between each participant and the State of Texas. But Texas has prevented federal wildlife officials or any member of the public from reviewing these certificates, leaving scientists in the dark as to what actual measures are being taken to protect the lizard, and leaving the Service unable to verify whether the agreements are being implemented.

6.      The Service maintains that the Texas conservation agreement eliminates the need to list the lizard under the ESA, but the Service has never actually reviewed the substance of the Texas agreement, has not been given access to the certificates of inclusion, does not know how many landowners are participating or what lands are covered, and does not have the independent ability to monitor or verify compliance.

7.      Compounding the problem, Texas has delegated authority to implement the agreement to a private entity called the "Texas Habitat Conservation Foundation," which is actually run by three lobbyists from the Texas Oil and Gas Association, the very industry that benefits from activities that destroy the lizard's habitat.

8.      The Service's decision not to list the lizard as an endangered or threatened species was arbitrary and capricious and violates the ESA and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 551, 701 *et seq.*

9.      First, the Service's decision not to list the lizard was not based on a reasonable analysis of the ESA's five statutory listing factors, 16 U.S.C. § 1533, and was not based on the best scientific data available, *id*. § 1533(b).

10.     Second, the Service's decision not to list the lizard is arbitrary and capricious and violates the Service's own policies because it is based on unproven, largely unimplemented, voluntary state conservation plans that do not adequately address threats to the lizard.

11.     As detailed further below, the Service's decision to withdraw the listing rule and deny ESA protection for the lizard suffers from numerous legal and scientific defects and should be set aside.

## JURISDICTION AND VENUE

12.     This action arises under the ESA, 16 U.S.C. § 1531 *et seq.*, and the APA, 5 U.S.C. §§ 551, 701 *et seq.* This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g), 28 U.S.C. §§ 1331 and 1346, and 5 U.S.C. § 702. Plaintiffs have properly given notice to Defendants of their claims under the ESA in accordance with 16 U.S.C. § 1540(g)(2).

13.     Venue is proper in the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, a substantial part of the events giving rise to the claim occurred in the District of Columbia, no real property is involved in this action, and at least one Plaintiff resides in this judicial district.

## PARTIES

14.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a non-profit 501(c)(3) organization headquartered in Washington, D.C. with field offices in Arizona,

Alaska, California, Florida, Idaho, Montana, Oregon, and Mexico. Founded in 1947, Defenders is a science-based conservation organization with more than 400,000 members nationwide. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitat on which they depend. Defenders advocates new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation and advocacy to defend wildlife and their habitat. Defenders is one of the nation's leading advocates for endangered species and has been involved in issues of ESA implementation for more than thirty-five years.

15.    Defenders brings this action on its own institutional behalf and on behalf of its members who derive scientific, aesthetic, recreational, and spiritual benefit from endangered and threatened species and their habitats. Defenders members have observed the lizard in the wild, attempted to photograph the lizard, and have ongoing interests in the lizard and its habitat. The interests of Defenders and its members in observing, studying, and otherwise enjoying the lizard and its habitat, and in obtaining and disseminating information regarding the survival of the lizard and its critical habitat, have been harmed by Defendants' actions.

16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit 501(c)(3) corporation with offices in San Francisco, Joshua Tree, and Los Angeles, California; Portland, Oregon; Silver City, New Mexico; Tucson and Flagstaff, Arizona; Anchorage, Alaska; Richmond, Vermont; Seattle, Washington; Minneapolis and Duluth, Minnesota; Las Vegas, Nevada; and Washington, D.C. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United States and the world. The Center has more than 40,000 members throughout the United States and the world.

17.    The Center brings this action on its own institutional behalf and on behalf

of its members, who derive scientific, aesthetic, recreational, and spiritual benefit from endangered and threatened species and their habitats. The Center's members have observed the lizard in the wild and have ongoing interests in the lizard and its habitat. The interests of the Center and its members in observing, studying, and otherwise enjoying the lizard and its habitat, and in obtaining and disseminating information regarding the survival of the lizard and its critical habitat, have been harmed by Defendants' actions.

18.     Unless the requested relief is granted, Plaintiffs' interests will continue to be injured by the Defendants' failure to list the lizard under the ESA. The injuries described above are actual, concrete injuries that are caused by Defendants and presently suffered by Plaintiffs and their members and will continue to occur unless relief is granted by this Court. The relief sought herein, which includes an order that Defendants reconsider the listing of the lizard and issue a new Final Rule within six months, would redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

19.     Defendant SALLY JEWELL, United States Secretary of the Interior, is the highest ranking official within the U.S. Department of the Interior and, in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior. She is sued in her official capacity.

20.     Defendant DANIEL M. ASHE is Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior authorized and required by law to protect and manage the fish, wildlife and native plant resources of the United States, including enforcing and implementing the ESA. The Service has primary authority for day-to-day administration of the ESA with respect to terrestrial species. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

21.     The dunes sagebrush lizard, also known as the sand dune lizard, is a small species of lizard that is only found in shinnery oak sand dune habitat, located in southeastern New Mexico and West Texas. Already naturally encompassing a very small area, this habitat has declined, is fragmented, and is threatened by herbicides and oil and gas development on public and private lands, among other things.

22.     The lizard has been awaiting federal protection since 1982 when the Service first identified it as a candidate for listing under the ESA.

23.     After twenty years of inaction on the part of the Service, in 2002, the Center for Biological Diversity filed a formal petition with the Secretary of the Interior to list the lizard as endangered or threatened.

24.     In its 2004 response to that petition, the Service found the lizard warranted listing but was precluded by other priorities. The Service retained the lizard on the candidate list in December 2004 with a listing priority number of "2," the highest possible priority for this species. 69 Fed. Reg. 77,167 (Dec. 27, 2004).

25.     In December 2008, the Service finalized a combined candidate conservation agreement/candidate conservation agreement with assurances ("CCA/CCAA") for New Mexico. The New Mexico agreement describes measures to avoid, minimize, and mitigate harmful impacts to the lizard, including "no leasing of lands within Conservation Lands" to oil, gas, or wind power development.

26.     On December 14, 2010, the Service proposed to list the lizard as endangered throughout its range, noting at the time that the three-inch long reptile "faces immediate and significant threats due to oil and gas activities, and herbicide treatments." 75 Fed. Reg. 77,801 (Dec. 14, 2010).

27.     In proposing listing, the Service concluded that the New Mexico agreement standing alone did not alleviate enough threats to avoid listing. 75 Fed. Reg. at 77,811. The Service specifically noted that the lizard's habitat in Texas remained

6

unprotected. *Id.* The Service stated:

> [T]he CCA/CCAA includes the entire range of the dunes sagebrush lizard in New Mexico, but does not extend into Texas. Because participation in the CCA/CCAA by both oil and gas and ranching operators is not occurring throughout the range of the dunes sagebrush lizard, the efficacy of these conservation agreements has not yet been fully implemented and determined to be effective. In order for the agreements to benefit the dunes sagebrush lizard, oil and gas operators need to enroll throughout the lizard's range, and habitat restoration and protection needs to occur in the dunes sagebrush lizard's habitat. The CCA/CCAA funded the initial investigation into the restoration of shinnery oak dunes, but for now there are no known methods to restore the dunes sagebrush lizard's habitat, and existing habitat should be protected by enrolling in the CCA/CCAA or with conservation easements. The current efforts have not provided the protection needed to remove or lessen the significant threats posed to the dunes sagebrush lizard.

*Id*.

28.     In February 2012, the Service approved a combined candidate conservation agreement/habitat conservation plan ("CCAA/HCP") developed by the State of Texas that was intended to cover the species' range in Texas.

29.     Both the New Mexico and Texas agreements offered private and state landowners an important incentive to participate: a legal assurance that if the lizard became listed, the landowners will not be required to take any conservation measures or face any land use restrictions beyond those identified in the agreement. Landowners who participate in these candidate conservation agreements are issued a certificate of inclusion detailing the conservation commitments that they have made and all other terms of the agreement.

30.     On June 19, 2012, the Service withdrew its 2010 proposal to list the lizard as endangered and issued a "not warranted" determination. The Service's basis for its about-face was the development of the two voluntary lizard conservation agreements in New Mexico and Texas. The Service claimed these efforts to protect the lizard's shinnery oak dune habitat and reduce impacts from Permian Basin drilling were sufficient to protect the species from extinction. 77 Fed. Reg. 36,872 (June 19, 2012). In addition, the

Service cited new scientific information from Texas A&M University that has identified some additional occupied sites for the lizard. *Id.*

31. At the time of the withdrawal of the proposed rule, the Service stated that the New Mexico CCA/CCAA involved 29 enrolled companies and landowners for a total of 650,241 acres—83% of the existing lizard habitat in New Mexico. 77 Fed. Reg. at 36,884-85. The Service did not indicate how many companies or landowners participated in the Texas program but the agency did state that the Texas program covered 71% of mapped lizard habitat in Texas, or 138,640 acres. 77 Fed. Reg. at 36,885.

32. Although the details of the conservation measures contained in the New Mexico conservation agreements are available to the Service and the public, the same is not true for the Texas CCAA/HCP.

33. The Service did not make available to the public the certificates of inclusion from the Texas CCAA/HCP, which contain the terms of the agreements and detail what, if any, conservation benefits the Texas program may offer for the lizard. The Service also has not made available to the public the number of enrolled landowners and companies involved in the Texas agreement and the location of the lands enrolled.

34. As detailed further below, the Service is unable to provide this information because the State of Texas has not released this information to the Service, citing confidentiality concerns.

35. The CCAA/HCP permit holder is the Texas Comptroller of Public Accounts. The Texas Comptroller's Office, in turn, has delegated authority for the program to a private entity, the Texas Habitat Conservation Foundation. The Foundation negotiates the terms of each certificate of inclusion with the landowner, with no involvement or review from the Service. The Foundation also has the responsibility to oversee and monitor the agreements and issue monthly and annual reports indicating whether any habitat has been disturbed. The Foundation was created for this purpose.

36. The three founding board members of the Texas Habitat Conservation

Foundation are all registered lobbyists for the Texas Oil and Gas Association. The business organization filing for the Foundation, obtainable from the Texas Secretary of State's office, lists three and only three directors: Rob Looney, Deb Hastings, and Mari Ruckel. Deb Hastings signed the filing as the registered agent for the Foundation.

37.     Their positions with the Texas Oil and Gas Association are: Rob Looney – President; Deb Hastings – Executive Vice-President; Mari Ruckel – Vice-President for Regulatory Affairs. *See also* Jay Root, *Oil Lobbyists Oversee Protection of Threatened Lizard*, The Texas Tribune, April 24, 2013, *available at* http://www.texastribune.org/2013/04/24/oil-lobbyists-oversee-threatened-lizard-protection/.

38.     Thus the entity that is in charge of protecting the lizard, negotiating the terms of conservation agreements, and monitoring and reporting on habitat loss pursuant to those agreements, is controlled by the very industry that the Service has found most threatens the lizard. Although industry involvement might be laudable if it were transparent and the results verifiable, that is not the case here.

39.     Defenders staff requested copies of the Texas certificates of inclusion from the Service, and the Service was unable to provide them. Conversations with Service staff on August 1, 2012, revealed that the Service does not review or approve the certificates of inclusion before they are finalized by the CCAA/HCP permit holder. Rather, the Texas Comptroller's Office, through the Texas Habitat Conservation Foundation, negotiates the terms of each certificate of inclusion with the landowner, with no involvement or review from the Service.

40.     The Service stated that it did not even know the number of certificates of inclusion or the number of landowners enrolled in the plan.

41.     The Service also does not know the duration of the landowner agreements. Although the Service touts the CCAA/HCP as having a duration of up to thirty years, in fact, the actual terms may be much less.

42.     The New Mexico CCAA states: "The duration of participation will be at least 5 years, but can be the full duration of the CCAA" (which in New Mexico's case is twenty years). *See* Candidate Conservation Agreement with Assurances for the Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*) and Sand Dune Lizard (*Sceloporus arenicolus*) at 5, *available at* http://www.fws.gov/southwest/es/Documents/R2ES/LPC-SDL_CCA-CCAA_2008.pdf**.** The withdrawal decision never describes the duration of the certificates of inclusion under the New Mexico CCAA, or whether any of the participants have enrolled for terms beyond the five-year minimum (let alone the twenty-year maximum).

43.     Landowners in Texas can sign up for a duration of their choosing—there are no minimum terms—and they can also drop out without penalty. Thus the Service not only has no idea how many landowners are committed to participating in the agreement, it also does not know for how long they have committed to participate.

44.     Defenders staff contacted Jason Brooks, who was then executive director of the Texas Habitat Conservation Foundation on August 1, 2012. Mr. Brooks confirmed that the Service does not review or approve the certificates of inclusion before they are finalized. He further asserted that the certificates of inclusion were confidential and not available to the public, even in redacted versions. He also stated that the number of certificates of inclusion is confidential.

45.     Defenders staff then contacted the Texas Comptroller's office on September 6, 2012. Lisa Elledge, the Stimulus Program Manager at Texas Comptroller of Public Accounts, also stated that the certificates of inclusion were not available to the public. Nor could they release the conservation measures contained in the certificates of inclusion. She likewise confirmed that the Service does not review the certificates. She suggested that Defenders file an open records request.

46.     On September 14, 2012, Defenders attorney Ya-Wei Li submitted an open records request to the Texas Comptroller of Public Accounts seeking copies of the

certificates of inclusion for the Texas Habitat Conservation Plan and information about the conservation measures contained within the certificates.

47.     On October 5, 2012, the Texas Comptroller's office sent a letter to The Honorable Greg Abbott, Attorney General of Texas, asserting that the certificates should be shielded in their entirety from public disclosure. The letter requested that the Attorney General's office "issue a ruling protecting the entire Certificates of Inclusion responsive to the request as confidential." Letter from James G. Nolan, Open Records Attorney to The Honorable Greg Abbott, Attorney General of Texas, Oct. 5, 2012. Defenders attorney Ya-Wei Li, Esq. was cc'd on the letter.

48.     The letter further confirms that the certificates of inclusion were never delivered to the Service, and indicates that they are withheld from the Service in order to preserve the confidentiality of the records.

49.     On December 3, 2012, the Texas Attorney General issued an official opinion confirming the Comptroller's interpretation of Texas confidentiality law. According to the opinion, all the certificates of inclusion, in their entirety, are shielded from public review. Letter from Jeffrey W. Giles, Assistant Attorney General of Texas to James G. Nolan, Open Records Attorney, Dec. 3, 2012.

50.     The Service's reliance on the Texas CCAA/HCP in withdrawing the proposed rule to list the lizard as endangered violates the ESA and is otherwise arbitrary and capricious.

51.     First, the Texas CCAA/HCP was only a few months old at the time of the withdrawal of the proposed rule. It had no track record of success. To date, there is no evidence that the plan is, in fact, conserving the lizard or that it has eliminated what the Service had determined were "immediate and significant" threats to the lizard from oil and gas development and other factors.

52.     Second, as noted above, participation in the CCAA/HCP is voluntary, so there is no way to know if promises made today will be kept. Indeed, now that the

proposed listing has been withdrawn, there is little to no incentive for enrollees to remain in the plan, and in Texas, there is no minimum requirement for participation. Although the Service optimistically suggests that additional landowners will seek to participate in the future, there is no justification for this conclusion.

53.     Third, the Texas CCAA/HCP does not specify what on-the-ground conservation measures are required for any particular enrolled landowner. The key avoidance and minimization recommendations for oil and gas developments are vague and filled with discretionary language such as "where possible" or "when feasible in the reasonable judgment of the participant" or "when practical." In other words, a participant in the plan could entirely fail to take any recommended conservation measures based on a subjective assessment of feasibility and still be counted as a participant.

54.     Fourth, the Service does not review or approve any certificates of inclusion before they are finalized. Certificates of inclusion are approved by the Texas Comptroller of Public Accounts, working through the Texas Habitat Conservation Foundation, which is controlled by the oil and gas industry.

55.     Fifth, the Service does not even obtain copies of the certificates of inclusion after the fact. Indeed, the Service does not know the number of certificates of inclusion in existence (only the number of acres covered is released) or which areas are covered by the certificates. The CCAA only describes possible areas of enrollment but does not indicate which areas are actually enrolled.

56.     The decision also violates the Service's own "Policy for Evaluation of Conservation Efforts When Making Listing Decisions" ("PECE"). Issued in 2003, the PECE policy sets criteria to be used "in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." 68 Fed. Reg. 15,100 (March 28, 2003).

57.     The two key factors in this PECE evaluation are: "(1) for those efforts yet to be implemented, the certainty that the conservation effort will be implemented and (2) for those efforts that have not yet demonstrated effectiveness, the certainty that the conservation effort will be effective." *Id*. at 15,114.

58.     For each factor, criteria are provided to evaluate the certainty that the effort will be implemented or that it will be effective, respectively. *Id*. at 15,115. "To consider that a formalized conservation effort(s) contributes to forming a basis for not listing a species…[the agency] must find that [it] is sufficiently certain to be implemented and effective so as to have contributed to the elimination or adequate reduction of one or more threats to the species identified through the section 4(a)(1) analysis." *Id*.

59.     Given how little information the Service actually has about the Texas CCAA/HCP agreement, the Service could not possibly have evaluated the agreement sufficiently to conclude, as it did, that conservation measures were certain to be implemented and effective and that threats to the lizard were abated to the point where a species proposed for listing as endangered now requires no federal protection.

60.     Plaintiffs sent the Secretary and the Director of the U.S. Fish and Wildlife Service a 60-day notice of intent to sue for violations of the ESA on March 14, 2013.

## CLAIMS FOR RELIEF

61.     For each of the Claims in this Complaint, Plaintiffs incorporate by reference each and every allegation set forth in this Complaint as if set out in full below.

## FIRST CLAIM

**The Service's decision to withdraw the proposed rule is contrary to the ESA's five listing factors, 16 U.S.C. § 1533(a)(1), does not reflect the best available science, 16 U.S.C. § 1533(b), and is contrary to the APA, 5 U.S.C. § 706.**

62.     The ESA permits the listing of any "species," which is defined to include any "subspecies of fish, wildlife or plant" and "any distinct population segment of species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). The

Act defines an "endangered" species as one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species, likewise, is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

63. The Service makes listing determinations on the basis of an analysis of the following factors: 1) the present or threatened destruction, modification, or curtailment of its habitat or range; 2) over utilization for commercial, recreational, scientific, or educational purposes; 3) disease or predation; 4) the inadequacy of existing regulatory mechanisms; or 5) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). Under the ESA, the Service is obligated to list a species if any *one* of the five listing factors is triggered.

64. The Service claims that the new Texas CCAA/HCP (in concert with the New Mexico CCA/CCAA) adequately protects the lizard and that, therefore, listing is not warranted. The Service's conclusion is arbitrary and capricious. In particular, the two state CCAAs are voluntary agreements and, therefore, may not be considered as existing regulatory mechanisms. Additionally, the agreements are unproven and have not been shown to have sufficiently eliminated threats to the lizard such that it no longer meets the definition of an "endangered species."

65. The final decision does not adequately explain away the clear threats identified in the proposed rule. The Service's analysis of the five listing factors essentially comes down to blind faith in the possibility that the Texas CCAA/HCP, when combined with other programs including the New Mexico CCA/CCAA, eliminates risk to the species. Yet the Service could not rationally come to this conclusion because the Texas CCAA/HCP has no track record and the Service does not even possess the relevant information necessary to evaluate the agreement.

66. In addition to the listing factors outlined in 16 U.S.C. § 1533(a), the ESA requires that listing determinations be based "solely on the basis of the best scientific and

14

commercial data available … after taking into account those efforts, if any being made by any State … or any political subdivision of a State … to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices." 16 U.S.C. § 1533(b)(1)(A).

67.     The Service's regulations further state: "The Secretary shall make [listing decisions] solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b).

68.     The withdrawal decision provides a conclusory sentence stating that the lizard does not meet the definitions of endangered or threatened based on the "three R's" of resiliency, redundancy, and representation. The decision includes no actual "analysis" showing how the Service applied the biological concepts and definitions to the facts.

69.     Additionally, the not warranted finding states that "habitat restoration done through the award system will offset this and have the positive effect of decreasing habitat fragmentation and providing for the long-term conservation of the species." 77 Fed. Reg. at 36885. This statement conflicts with the Service's conclusion in the December 2010 proposed rule, which states that "for now there are no known methods to restore the dunes sagebrush lizard's habitat." 75 Fed. Reg. at 77811. The not warranted finding fails entirely to explain this discrepancy and cites to no new research that would support the notion that there have been advances in habitat restoration sufficient to warrant a new conclusion.

70.     In withdrawing the proposed listing rule, the Service improperly evaluated the ESA's five statutory listing factors. The Service's reliance on the Texas CCAA/HCP and New Mexico CCA/CCAA as a basis for denying listing of the lizard is arbitrary and capricious and a violation of the ESA. 16 U.S.C. § 1533(a)(1); 5 U.S.C. § 706. The Service also failed to use the best available science and allowed political and other non-science factors to unduly influence the Service's decision. Accordingly, the Service's

decision is arbitrary and capricious and a violation of the ESA and the APA. 16 U.S.C. § 1533(b); 5 U.S.C. § 706.

## SECOND CLAIM

**The Service's decision to withdraw the proposed rule on the basis of unproven, unimplemented state conservation plans is arbitrary and capricious and violates the Service's own policies.**

71.     The ESA and Service regulations state that a species shall be listed if the Secretary determines, on the basis of the best scientific and commercial evidence available, that any one of five factors imperils a species. 16 U.S.C. § 1533(a)(1). The ESA further states that listing determinations must be made "solely on the basis of the best scientific and commercial data available … after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species…" 16 U.S.C. § 1533(b).

72.     As described above, the Service relied on unproved, unimplemented conservation plans to determine that the lizard no longer warranted listing. Although the Service may consider state efforts to protect a species when evaluating whether a species warrants listing, the Service's decision here to rely on the brand-new voluntary Texas CCAA/HCP without actually reviewing the terms of the agreement was arbitrary and capricious and violated both the ESA and the Service's own policies for considering state and private conservation efforts.

73.     Specifically, the Service's listing decision violates the Service's 2003 PECE policy for evaluating the effectiveness of non-federal conservation efforts when making listing determinations.

74.     For all of the reasons discussed above, the Service cannot rationally have concluded that the Texas conservation agreement—a completely voluntary agreement the terms of which the Service has never reviewed and has little ability to monitor—is "sufficiently certain to be implemented and effective so as to have contributed to the

elimination or adequate reduction of one or more threats to the species identified through the section 4(a)(1) analysis." 68 Fed. Reg. 15,115.

75.     The Service's decision to withdraw the proposed rule is not consistent with the ESA or its PECE policy and is arbitrary and capricious. 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court:

1.     declare that Defendants' June 2012 decision to withdraw the proposed listing rule for the lizard violates the APA and the ESA;

2.     set aside and remand Defendants' final decision to withdraw the proposed listing rule in accordance with the Court's ruling;

3.     order Defendants to reconsider the listing of the lizard and issue a new Final Rule within six months;

4.     award Plaintiffs their costs and attorneys' fees; and

5.     grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

DATED: June 19, 2013

Jason C. Rylander

Jason C. Rylander (D.C. Bar No. 474995)
Michael P. Senatore (D.C. Bar No. 453116)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
Telephone: (202) 682-9400 x 145
Facsimile: (202) 682-1331
jrylander@defenders.org
msenatore@defenders.org

Collette L. Adkins Giese
(MN Bar No. 035059X)*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 339
Circle Pines, MN 55014-0339

Telephone: (651) 955-3821
<u>cadkinsgiese@biologicaldiversity.org</u>

*Seeking admission *pro hac vice*

*Attorneys for Defenders of Wildlife and the
Center for Biological Diversity*