# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DEFENDERS OF WILDLIFE, *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 13-0919 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 19, 33, 36, 39 |
| | : | | |
| SALLY JEWELL, | : | | |
| Secretary, U.S. Department of the Interior, | : | | |
| *et al.*, | : | | |
| | : | | |
| Defendants, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| SUSAN COMBS, | : | | |
| Comptroller of Public Accounts | : | | |
| for the State of Texas, *et al.*, | : | | |
| | : | | |
| Intervenor Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING FEDERAL DEFENDANTS' AND INTERVENOR DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In 2012, the U.S. Fish and Wildlife Service ("FWS" or "Service") withdrew a proposed rule that would have listed the dunes sagebrush lizard as an endangered species. Subsequently, the Defenders of Wildlife and the Center for Biological Diversity ("Plaintiffs") brought suit against the Secretary of the Interior and the Director of the FWS ("Federal Defendants") to challenge the withdrawal decision. The Texas Comptroller of Public Accounts and several oil and gas industry associations intervened as defendants ("Intervenor Defendants"). Plaintiffs moved for summary judgment, contending that the withdrawal decision failed to account for all

of the statutory listing factors provided in the Endangered Species Act ("ESA"), did not rely on the best available science as mandated by the ESA, and was arbitrary and capricious in violation of both the ESA and Administrative Procedure Act ("APA"). Federal Defendants and Intervenor Defendants cross-moved for summary judgment, arguing that the FWS's withdrawal decision was lawful. Because the FWS's decision complied with the ESA and APA, the Court grants Federal Defendants' and Intervenor Defendants' cross-motions for summary judgment and denies Plaintiffs' motion for summary judgment.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). The ESA defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range," and defines a threatened species as one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* §§ 1532(6), 1532(20).

Section 4(a) of the ESA provides that the Secretary of the Interior, through the FWS, "shall by regulation . . . determine whether any species is an endangered species or a threatened species because of any" of five enumerated listing factors. *Id.* § 1533(a)(1). These listing factors are:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or

> (E) other natural or manmade factors affecting its continued
> existence.

*Id.* § 1533(a)(1)(A)–(E). Additionally, section 4(b) of the ESA requires the Secretary to make

listing decisions "solely on the basis of the best scientific and commercial data available to him

after conducting a review of the status of the species and after taking into account those efforts, if

any, being made by any State . . . to protect such species . . . ." *Id.* § 1533(b)(1)(A).

In 1999, the FWS and National Marine Fisheries Service ("NMFS") established a policy

to encourage states and private actors to undertake voluntary efforts to conserve candidate

species—those being considered for ESA listing. Under the Candidate Conservation

Agreements with Assurances ("CCAA") framework, in return for implementing agreed-upon

conservation measures, state and private entities receive "assurances from the Services that

additional conservation measures will not be required . . . should the species become listed in the

future." Announcement of Final Policy for Candidate Conservation Agreements with

Assurances, 64 Fed. Reg. 32,726, 32,727 (June 17, 1999). While CCAAs are designed to

"remov[e] any need to list the covered species," the mere existence of a CCAA will not preclude

listing. *Id.* Nonetheless, CCAAs have over time become a common mechanism for promoting

conservation of numerous candidate species.[1]

In 2003, the FWS and NMFS announced their Policy for Evaluation of Conservation

Efforts When Making Listing Decisions ("PECE"). *See* PECE, 68 Fed. Reg. 15,100 (Mar. 28,

2003). Pursuant to section 4(b)'s requirement that listing decisions be made "after taking into

account those [conservation] efforts, if any, being made by any State," 16 U.S.C.

§ 1533(b)(1)(A), the PECE allows FWS personnel making listing decisions to consider

---

[1] *See, e.g.*, 78 Fed. Reg. 76,639 (Dec. 18, 2013) (announcing CCAA availability for lesser prairie chicken); 78 Fed. Reg. 43,912 (July 22, 2013) (announcing CCAA availability for Rio Grande cutthroat trout).

conservation efforts that have not yet been implemented, so long as the Service evaluates "the certainty that the conservation effort will be implemented," 68 Fed. Reg. at 15,114.[2] Similarly, the PECE enables the FWS to consider conservation efforts that have not yet demonstrated effectiveness, if the Service evaluates "the certainty that the conservation effort will be effective." *Id.*[3] In sum, the FWS must conclude that future efforts are "sufficiently certain to be implemented and effective." *Id.* at 15,115.

## B. The Dunes Sagebrush Lizard

The dunes sagebrush lizard (*Sceloporus arenicolus*), also known as the sand dune lizard, is a light-brown lizard under three inches in length. It is found only in its shinnery oak dune habitat, where wind patterns create parabolic dunes dependent on shinnery oak in areas with sandy soils. *See* AR8230. The lizard's habitat spans approximately 745,000 acres, of which roughly 73% is found in New Mexico, and 27% in Texas. *See* AR8305. Additionally, much of

---

[2] With respect to certainty of implementation, PECE outlines the following nine criteria to direct the agencies' analysis: (1) the conservation effort, the parties to the effort, and funding and resources to implement the effort; (2) the legal authority of the parties to the conservation effort and their commitment to proceed; (3) the legal procedural requirements necessary to implement the effort; (4) the authorizations necessary to implement the conservation effort; (5) identification of the "type and level of voluntary participation . . . necessary to implement the conservation effort," and a "high level of certainty" that participation will occur; (6) the existence of regulatory mechanisms necessary to implement the conservation effort; (7) a high level of certainty that the parties will obtain the necessary funding; (8) an implementation schedule; and (9) approval by all parties to the agreement or plan. 68 Fed. Reg. at 15,114–15,115.

[3] With respect to certainty of effectiveness, the agencies use the following criteria to direct the analysis: (1) the nature and extent of threats being addressed by the conservation effort and the method for reducing the threats; (2) explicit incremental objectives and dates for achieving them; (3) detailed identification of the steps necessary to implement the conservation effort; (4) identification of quantifiable, scientifically valid parameters that will demonstrate achievement of objectives; (5) provisions for monitoring and reporting progress on implementation and effectiveness; and (6) incorporation of "principles of adaptive management." 68 Fed. Reg. at 15,115.

the lizard's New Mexico habitat lies on federal land managed by the Bureau of Land Management ("BLM"). *See* AR8341.

The lizard's shinnery oak dune habitat also happens to be located in the Permian Basin, one of the most significant sources of oil and gas in the United States. *See* 77 Fed. Reg. 36,872, 36,887. Over time, oil and gas development, along with the use of herbicides, began to threaten and fragment the lizard's shinnery oak dune habitat. Having noted significant habitat loss in the 1980s and 1990s, the Service identified the lizard in 2001 as a candidate species. 66 Fed. Reg. 54,808, 54,811 (Oct. 30, 2001).

In December 2010, the FWS issued a proposed rule listing the lizard as endangered, "based on the immediacy, severity, and scope of the ongoing significant threats." Proposed Rule: Endangered and Threatened Wildlife and Plants; Endangered Status for Dunes Sagebrush Lizard, 75 Fed. Reg. 77,801, 77,813 (Dec. 14. 2010). As explained in the Proposed Rule, the lizard is considered to be a "habitat specialist because it has adapted to thrive only in a narrow range of environmental conditions that exist within shinnery oak dunes," and its survival "is directly linked to the quality and quantity of available shinnery oak dune habitat." *Id.* at 77,803. FWS noted that 40% of the lizard's habitat in New Mexico was no longer suitable, that oil and gas development further threatened the habitat, and that habitat fragmentation was causing population loss. *See id.* at 77,805. Following publication of the proposed rule, the Service held hearings in New Mexico and Texas during the sixty-day public comment period. The Service twice reopened the comment period, which ultimately closed in March 2012. *See* 77 Fed. Reg. 11,061 (Feb. 24, 2012).

In June 2012, the FWS withdrew its proposed rule listing the lizard. *See* Withdrawal of the Proposed Rule to List Dunes Sagebrush Lizard, 77 Fed. Reg. 36,872 (June 19, 2012). In

summarizing its conclusions, the Service explained that "the threats to the species . . . no longer are as significant as believed at the time of the proposed rule" and that this finding rested on "analysis of current and future threats and conservation efforts" and "the best scientific and commercial data available." *Id.* at 36,872. In particular, the FWS relied upon "significant ongoing and future conservation efforts, in combination with new information on the status and distribution of the species." *Id.* at 36,898.

### C. The Conservation Agreements

In declining to list the dunes sagebrush lizard as endangered, the FWS assessed the protections afforded to the lizard by three distinct conservation mechanisms: (1) the Bureau of Land Management's Special Status Species Resource Management Plan Amendment ("BLM's RMPA"), (2) New Mexico's Candidate Conservation Agreement and Candidate Conservation Agreement with Assurances (collectively "New Mexico Agreement"), and (3) the Texas Candidate Conservation Agreement with Assurances and Habitat Conservation Plan ("Texas Plan"). Collectively, the three mechanisms covered approximately 89% of the lizard's habitat. AR8333, 8305.

Since 2008, the BLM's RMPA has provided internal guidance to BLM staff for conserving the dunes sagebrush lizard on land managed by the BLM in New Mexico—54% of the lizard's entire range, as of the withdrawal decision. 77 Fed. Reg. at 36,896. Among other measures, the RMPA allows the BLM to place oil and gas development up to 200 meters (650 feet) outside the lizard habitat, prioritizes habitat reclamation, and prohibits herbicide usage. *Id.* Additionally, pursuant to the RMPA, BLM identified 53,657 ha (132,590 ac) that were "currently unleased dunes sagebrush lizard habitat that will be closed to future leasing." *Id.*

The New Mexico Agreement took effect in 2008. AR7720. At the time of the FWS's withdrawal decision, the New Mexico Agreement covered 83% of the lizard's habitat in that state, and combined with lands covered by the BLM's RMPA, 95% of the habitat in New Mexico was enrolled in some conservation agreement. AR8256, 8289, 8333. Parties subject to the New Mexico Agreement agree to (1) refrain from undertaking new oil and gas development in the lizard's habitat, (2) reclaim the lizard's habitat to remedy fragmentation, (3) refrain from new pipeline construction in the habitat, (4) refrain from using herbicide treatments in the habitat, and (5) prevent mesquite encroachment into the habitat. AR7725.[4]

Concluded in February 2012, the Texas Plan aims "to facilitate continued and uninterrupted economic activity in the Permian Basin . . . and to promote conservation of the [dunes sagebrush lizard] . . . in response to the proposed listing of the [lizard] by the FWS." AR4372.[5] Participants in the Texas Plan must implement and maintain conservation measures to which they contractually agree in a Certificate of Inclusion. AR4376. These measures aim to avoid activities that would degrade habitat; if avoidance is not possible, participants must minimize habitat impacts, or alternatively mitigate habitat loss. *See* 77 Fed. Reg. at 36,885.[6] On

---

[4] The New Mexico Agreement consists of a Candidate Conservation Agreement ("CCA") and a CCAA. Under the CCA, the BLM, the FWS, and the non-profit organization Center for Excellence for Hazardous Materials Management ("CEHMM") agreed "to ensure that lessees of federal public lands managed by BLM take additional conservation measures for [the] lizard which are not currently required by law." AR7724. In the CCAA, the FWS and CEHMM agreed "to enlist private landowners, lessees of private lands, and the State of New Mexico and its lessees to undertake voluntarily the same conservation measures on private and state lands that are contained in the CCA for federal lands." AR7725.

[5] The Texas Plan is implemented in two ways—through a CCAA program and a Habitat Conservation Plan that would take effect if the lizard is ever listed as endangered. AR4377. Because the lizard has not been listed, only the CCAA is relevant to this case.

[6] The Texas Plan provides that "[w]hen feasible in the reasonable judgment of the Participant, Well Sites should be developed outside of [dunes sagebrush lizard] habitat," and "when feasible in the reasonable judgment of the Participant, [Participants should] avoid [dunes sagebrush lizard] Habitat." AR4411–12. Mitigation measures include reclaiming abandoned

a monthly reporting basis, a third party tracks impacts to the lizard habitat. AR4425. In the first three years of the Texas Plan's implementation, habitat loss coming within 7.5% of the allowed 1% loss in total habitat "will trigger a review between the Permit Holder and the FWS through the Adaptive Management process" outlined in the Texas Plan. AR4426. In return for participation, the FWS issues permits authorizing incidental takes of the lizard, should it ever be listed as an endangered species. AR4396–97.

*    *    *

In June 2013, Plaintiffs commenced this action against Federal Defendants, challenging the FWS's withdrawal of its proposed rule listing the dunes sagebrush lizard as endangered. *See* Compl. ¶¶ 62–75, ECF No. 1. This Court granted the Intervenor Defendants' motion to intervene given their role in developing the various conservation plans upon which the FWS relied in deciding not to list the lizard.[7] Plaintiffs subsequently moved for summary judgment, contending that the withdrawal decision failed to account for all of the statutory listing factors provided in the ESA, did not rely on the best available science as mandated by the ESA, and was arbitrary and capricious in violation of both the ESA and APA. *See* Pls.' Mot. Summ. J., ECF No. 19. Federal Defendants and Intervenor Defendants cross-moved for summary judgment, arguing that the withdrawal decision was lawful. *See* Fed. Defs.' Cross-Mot. Summ. J., ECF No. 33; Comptroller's Cross-Mot. Summ. J., ECF No. 36; API's Cross-Mot. Summ. J., ECF No. 39.

---

locations, removing abandoned service roads and equipment from abandoned locations, removing abandoned or unused fencing, establishing preservation lands, and conducting research and monitoring programs to assess the impacts of mitigation efforts. AR4418.

[7] The Court granted unopposed motions to intervene as of right, filed by the Texas Comptroller of Public Accounts Susan Combs, the American Petroleum Institute, the Independent Petroleum Association of America, the New Mexico Oil and Gas Association, the Permian Basin Petroleum Association, and the Texas Oil & Gas Association. *See* ECF No. 11.

# III.  STANDARD OF REVIEW

Typically, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But when assessing a summary judgment motion in an APA case, "the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law, and only a question of law."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  "In such a case, summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011).  "Moreover, the party challenging an agency's action as arbitrary and capricious bears the burden of proof."  *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts in an arbitrary and capricious manner if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Judicial review of agency action under the ESA is similarly governed by the arbitrary and capricious standard. *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the Administrative Procedure Act . . . ."); *accord WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 4 (D.D.C. 2009).

"The Court will give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'" *Oceana, Inc. v. Pritzker*, No. 11-1896, 2014 WL 912364, at *5 (D.D.C. Mar. 10. 2014) (quoting *Huls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996)). And "[w]hen examining a scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Id.* (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)).

## IV.  ANALYSIS

Plaintiffs contend that, in withdrawing its proposed rule listing the dunes sagebrush lizard as endangered, the FWS failed to account for all of the statutory listing factors provided in the ESA, did not rely on the best available science as mandated by the ESA, and acted in an arbitrary and capricious manner in violation of the ESA and APA. The Court addresses each argument in turn.

### A.  The FWS properly considered the five ESA listing factors both individually and cumulatively.

Plaintiffs argue that the FWS's withdrawal of the proposed rule violated the ESA because the Service failed to consider adequately the five ESA listing factors. *See* Pls.' Mot. Summ. J. 32–38. In response, Federal Defendants and Intervenor Defendants argue that FWS properly

analyzed the statutory factors in reaching its conclusion.  *See* Fed. Defs.' Cross-Mot. Summ. J.

35–41; Comptroller's Cross-Mot. Summ. J. 39–43; API's Cross-Mot. Summ. J. 19–25.

The Court concludes that FWS sufficiently considered the five ESA listing factors—both

individually and cumulatively.  First, the FWS addressed at length listing factor A—"the present

or threatened destruction, modification, or curtailment of its habitat or range."  16 U.S.C. §

1533(a)(1)(A).  The Service recognized that habitat loss was "[t]he greatest threat" to the species

but ultimately found that "more than 50 percent of the dunes sagebrush lizard's habitat is not

fragmented, and provides adequate core habitat . . . ."  77 Fed. Reg. at 36,887–89.  Based on

several studies, the FWS further concluded that larger, less fragmented habitat patches would

"support higher populations and decrease the chance of local population loss and extinction."

*Id.*[8]  The FWS also cited a 2011 effort undertaken by scientists at Texas A&M University that

delineated the lizard's habitat in Texas, based on fifty surveys throughout its in-state range.  *Id.*

at 36,874.

The FWS further explained that the threat of habitat loss was sufficiently ameliorated by

the three conservation mechanisms—the BLM's RMPA, the New Mexico Agreement, and the

Texas Plan—which "provide conservation measures . . . to restore degraded habitat, and to

reduce fragmentation or restore connectivity. . . ."  *Id.* at 36,894.[9]  The FWS reasoned that

---

[8] The FWS cited studies regarding the Coachella Valley fringe-toed lizard (also a sand-dwelling lizard) and the Florida scrub lizard (also part of the *Sceloporus* genus), which found that larger patch sizes "significantly influenced recruitment and survivorship."  77 Fed. Reg. at 36,887.  Additionally, a 2011 study "showed [that] habitat quantity and quality for the dunes sagebrush lizard were positively correlated," and that "more dunes sagebrush lizards were found in large areas of abundant habitat, regardless of whether the overall landscape was fragmented." *Id.* at 36,888.  FWS also cited a 2009 study finding that "dunes sagebrush lizards were captured at much lower frequencies on fragmented grids compared to unfragmented grids." *Id.*

[9] Discounting the reclamation aspects of the various plans, Plaintiffs argue that the FWS stated it could not create shinnery oak dune habitat.  *See* Pls.' Mot. Summ. J. 31.  Plaintiff misreads the FWS's PECE analysis, which states: "We do not have the ability to create shinnery

"[b]ecause of these agreements, the RMPA, and the habitat that has been removed from leasing, the Service concludes that oil and gas development will not continue within dunes sagebrush lizard habitat at historical rates." *Id.*[10] Accordingly, because "current habitat conditions will be maintained or improved," the FWS "no longer finds this factor to be a threat, either now or in the future." *Id.* at 36,895. In sum, the FWS reasonably concluded that because of the conservation agreements and the efforts to mitigate habitat loss and reclaim habitat, listing factor A no longer warranted listing the lizard.[11]

---

oak dune habitat. However, restoring connectivity between currently suitable shinnery oak dunes by removing unsuitable habitat is instrumental in restoring larger contiguous habitat patches. Reclaiming roads and pads should restore connectivity and reduce fragmentation." AR7732. Thus, while the FWS conceded it could not create *new* shinnery oak dune habitat, it recognized that certain measures could defragment and restore *existing* habitat.

[10] Specifically, the FWS relied on a 2011 BLM survey finding that "[t]he presence of [dunes sagebrush lizards] in reclaimed areas associated with oil and gas activities implies reclamation efforts can successfully contribute to the defragmentation of [dunes sagebrush lizard] habitat." R205.

[11] Plaintiffs further argue that the FWS failed to consider other habitat threats—mesquite encroachment, herbicide usage, and grazing. This claim is belied by the record. The FWS found that each of the conservation agreements employ "measures . . . to control [mesquite encroachment] as necessary." 77 Fed. Reg. at 36,894. Specifically, in its PECE analysis, the FWS explained that in New Mexico, "mesquite removal near shinnery oak dunes has already been done and future locations that could benefit from mesquite removal have been identified." AR7729. And while mesquite removal was not mandated by the New Mexico Agreement, the FWS found that no participant had yet declined to undertake these efforts. AR7730. The Texas Plan, for its part, addressed the "prevalence of mesquite in west Texas" by creating incentives for participants in the form of a Certificate of Inclusion "that targets mesquite removal on their lands." AR7742. The FWS addressed grazing threats as well, concluding that the "New Mexico [Agreement] include[s] conservation measures that are focused on . . . decreasing impacts that may occur from grazing." *See* 77 Fed. Reg. at 36,892. The Texas Plan similarly aims to "manag[e]" grazing such that the lizard habitat is avoided. AR4411. As for herbicide usage, the FWS found that the BLM's RMPA prohibits herbicide treatment in the dunes sagebrush lizard habitat, *see id.*, and that the New Mexico Agreement "direct[s] new development and herbicide treatments outside of suitable and occupied habitat," *id.* at 36,886; *see also* AR7095 (explaining that New Mexico Agreement enrollees must agree that "[n]o herbicide treatments will be applied in dune complexes . . . ."). The Texas Plan also prohibits herbicide application on shinnery oak within habitat areas and imposes limits on other herbicide applications. AR4413–14.

Likewise, the FWS gave sufficient consideration to listing factor D—"the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). The Service's analysis under factor D centered on the BLM's RMPA, which had "exist[ed]" since 2008.[12] The FWS first found that in accordance with the RMPA, BLM identified 53,657 ha (132,590 ac) that were "currently unleased dunes sagebrush lizard habitat that will be closed to future leasing." 77 Fed. Reg. at 36,896. FWS further found that the BLM's RMPA "prioritizes the reclamation of nonfunctioning oilfield development in areas that will most benefit the dunes sagebrush lizard." *Id.*

Plaintiffs claim that because the FWS found the BLM's RMPA to be inadequate when it issued the proposed rule in 2010, the 2012 withdrawal decision's reliance on the RMPA was arbitrary and capricious. But in its withdrawal decision, the FWS explained that when it initially proposed listing the lizard, it "did not have a full understanding of how BLM implements the RMPA," and that subsequently, the BLM provided additional "detailed information" about this implementation. *Id.* The FWS found particularly salient the fact that "no exceptions have been made to the conservation measure that keeps development outside" of the lizard habitat. *Id.*[13] The Service further concluded that "BLM does not treat the RMPA as discretionary guidance, but instead implements it with all activities" in the habitat. *Id.* On the basis of this additional

---

[12] In New Mexico and Texas, there were no laws in place to protect the dunes sagebrush lizard. 77 Fed. Reg. at 36,896. However, as set forth below, the FWS properly assessed the New Mexico Agreement and Texas Plan under its PECE. *See infra* Part IV.C.2.

[13] In the proposed rule, the Service assumed that an RMPA provision providing that the BLM "may move development out of dunes sagebrush lizard habitat up to 200 meters" established an optional, unenforceable rule. 77 Fed. Reg. at 36,896. The BLM's comments, however, explained that the provision authorizes the BLM to move development up to 200 meters "without further analysis," and that if the BLM moves development beyond 200 meters, "further analysis and documentation must first occur." *Id.* The FWS noted in its withdrawal decision that "[t]he BLM has not issued exceptions to this conservation measure, and exceptions . . . are very difficult to obtain." *Id.*

information, the FWS was satisfied that the BLM's RMPA functioned as an adequate regulatory mechanism.[14]

As for the cumulative impacts of all five listing factors, the FWS concluded that although the potential threats to the lizard "could work in concert with one another . . . to the point that they may, in combination, become significant threats, . . . the suite of conservation efforts in the RMPA, the New Mexico Agreement, and Texas Plan address and alleviate all of the threats to the dunes sagebrush lizard adequately for the species to continue to be viable into the future." *Id.* at 36,897. Plaintiffs challenge the FWS's cumulative analysis, drawing comparisons to the analysis found deficient in *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89 (D.D.C. 2010). In that case, the FWS's statement on cumulative impacts consisted of: "Although we agree that these factors are hindering recovery of the species, we disagree that the level of threat is significant enough to warrant endangered status." *Id.* at 101. The court found this analysis to be conclusory and unsupported by the record, and therefore concluded that the withdrawal decision was arbitrary and capricious. *Id.* at 101–103. Here, while the FWS's cumulative impacts analysis is rather terse, it is based on more than an unsupported conclusion, as in *WildEarth*. The FWS relied on the panoply of conservation efforts taken by the BLM, Texas, and New Mexico,

---

[14] Plaintiffs do not challenge the FWS's consideration of the other listing factors individually—factors B, C, and E. 16 U.S.C. § 1533(a)(1)(B), (C), (E). In any event, the FWS's analysis was sound. In assessing listing factor B—"overutilization for commercial, recreational, scientific, or educational purposes," the FWS found that the lizard was not a commercially valuable species. 77 Fed. Reg. at 36,895. Under listing factor C—disease or predation—the FWS found that because the lizard's predator is found in higher numbers "along edge habitats than in interior habitat patches," "remaining unfragmented interior habitat will have decreased predation pressure, and thus predation does not pose a significant threat to the species as a whole now or in the future." *Id.* As for listing Factor E—other natural or manmade factors affecting the species' continued existence—the FWS found that because the conservation agreements would direct development away from the lizard's habitat, "the risk of competition, and exposure to pollutants, will only be localized stressors, and will not pose significant threats to the species as a whole." *Id.* at 36,897.

and found that such efforts alleviated and addressed those threats. 77 Fed. Reg. at 36,897.

Plaintiffs present no evidence that the cumulative effect of the various factors changes the

analysis. Given that the FWS thoroughly assessed a wide range of conservation efforts, its

withdrawal decision was not arbitrary and capricious.

### B. FWS relied on the best available science in its assessment of the various conservation efforts.

Plaintiffs also argue that the FWS's withdrawal decision violated the ESA by not resting

"solely on . . . the best scientific and commercial data available . . . ." 16 U.S.C. §

1533(b)(1)(A); *see also* Pls.' Mot. Summ. J. 38–40. Plaintiffs argue that the withdrawal decision

was driven instead by "considerable political pressure," *id.* at 38–39, as evinced by the temporal

proximity between the Texas Plan's adoption and the subsequent withdrawal decision. Federal

Defendants and Intervenor Defendants contend that the FWS's analysis amply satisfied the "best

available science" standard. *See* Fed. Defs.' Cross-Mot. Summ. J. 41–43; Comptroller's Cross-

Mot. Summ J. 43–44; API's Cross-Mot. Summ. J. 30–34.

The D.C. Circuit has determined that the "best data available" standard imposes no

obligation to conduct independent studies or "to find and consider any information [that may be]

susceptible to discovery." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C. Cir.

2000). Instead, an agency is prohibited only from disregarding scientifically superior evidence

available at the time. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 435 (D.C. Cir. 2012)

("[T]he Service is entitled to rely upon the best data available . . . .").[15] When a party challenges

---

[15] *See also City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989) (acknowledging that § 1533 "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence . . . relie[d] on").

the validity of data cited by an agency, the court is responsible for assessing the evidence, but may not "impos[e] an obligation upon the Secretary to find better data." *Babbitt*, 215 F.3d at 61.

At the outset, the Court notes that although the withdrawal decision followed soon after the Texas Plan's adoption, the FWS had in fact been working on drafts of the Plan since July 2011—almost a year before its decision. *See* AR1739. The Plaintiffs do not deny that the Service addressed new information about the implementation of the BLM's RMPA or that it undertook PECE evaluations of both the New Mexico Agreement and Texas Plan, which collectively covered 89% of the species habitat at the time. *See* AR7732 (analysis of BLM's RMPA); AR7720–7758 (PECE analyses). In addition, the FWS reviewed input from experts, state governments, and other government agencies, and considered extensive scientific studies of the dunes sagebrush lizard and its habitat. AR8090–93, 8234–35, 8238–8252; 8284–8292. This Court's review is further constrained by the principle that "[t]he rationale for deference is particularly strong when the agency is evaluating scientific data within its technical expertise." *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) (internal alteration omitted).

Moreover, the presence of political pressure alone says nothing about whether the FWS's scientific data was indeed the "best available." Plaintiffs proffer no scientifically superior data from the administrative record that FWS failed to consider; rather, they simply assert that "considerable political pressure" caused FWS to "rel[y] upon voluntary conservation agreements and assurances from the oil and gas industry interests . . . ." Pls.' Mot. Summ. J. 39–40.

Accordingly, the Court finds that the FWS's withdrawal decision rested on "the best scientific and commercial data available," as required by the ESA. 16 U.S.C. § 1533(b)(1)(A).

**C.  Because the FWS's withdrawal decision reasonably relied on the Texas Plan and complied with the Service's policies, the decision was not arbitrary and capricious.**

Plaintiffs argue that the FWS's decision not to list the lizard was arbitrary and capricious under the ESA and APA on two related but independent grounds.  First, they claim that the Service irrationally relied on a vague and unproven Texas Plan.  Second, they argue that Service's confidence in the success of the various conservation mechanisms violated the PECE's requirement that FWS, when assessing future conservation efforts, must confirm the "certainty" of implementation and effectiveness.  *See* Pls.' Mot. Summ. J. 17–32.  The Court rejects both claims and concludes that the FWS's withdrawal decision was not arbitrary and capricious.

**1.  Because the Texas Plan had sufficiently clear objectives and enabled regular monitoring, the FWS's reliance upon the Texas Plan was reasonable, notwithstanding the confidentiality of the Certificates of Inclusion.**

Plaintiffs argue that the FWS's reliance on the Texas Plan was arbitrary and capricious because the Service did not—and could not—review the Certificates of Inclusion detailing conservation measures adopted by each participant, which are confidential under Texas law.  *See* Tex. Gov't Code Ann. §§ 403.454, 552.101 (West 2011).  Without access to the Certificates, they claim, the Service "could not rationally have concluded that the Texas [Plan] is sufficiently certain to be implemented and effective . . . ."  *See* Pls.' Mot. Summ. J. 28 (internal quotation marks omitted).  Federal Defendants and Intervenor Defendants submit that access to each individual Certificate is unnecessary given that the FWS is fully able to monitor the Texas Plan at an aggregate level.  Fed. Defs.' Cross-Mot. Summ. J. 16–21; Comptroller's Cross-Mot. Summ. J. 38.

Having reviewed the administrative record, the Court cannot agree with Plaintiffs' assertion.  First, prior to the withdrawal decision, the Service had learned that most Certificates

of Inclusion would require avoidance of lizard habitat. *See* AR7742 (explaining that most development "occurs or will likely occur either outside of habitat complexes or within the spaces in between where habitat does not occur"). Where avoidance and minimization efforts are not feasible, each Texas Plan participant is obligated, at the minimum, to mitigate habitat loss. *See supra* note 6. Moreover, the Comptroller must submit to the FWS monthly and annual reports to enable it to adequately monitor implementation and compliance. *See* AR4512–13.

Plaintiffs assert that the FWS could only have been certain of the Texas Plan's efficacy if it had known "on which property [habitat] disturbance is occurring," Pls.' Reply Supp. Mot. Summ. J. 5, ECF No. 41, and whether "any particular landowner will implement conservation measures," *id.* at 9. This heightened precision is necessary, they submit, because certain "high quality, unfragmented habitat parcels" are more critical than others, but under the Texas Plan, the amount of "incidental take" is reported at the "Habitat Classification" level, of which there are only four. *Id.* However, as the Service explains, the four Habitat Classification levels actually correspond to habitat quality and the likelihood of lizard occurrence.[16] Because the Texas Plan limits habitat loss within each level, AR4535–36, and because the amount of habitat enrolled in each level is known, AR8044, the FWS can monitor losses within each quality level, thereby protecting the most critical areas about which Plaintiffs are concerned.[17]

---

[16] The four levels are: "very high" likelihood, "high" likelihood, "low" likelihood," and "very low" likelihood. AR4583–85.

[17] Moreover, the required annual reports will provide other data at the level of each *individual dune complex*: For each "numbered and individually identified" dune complex, AR4513, the Service will be provided data "at a scale-of-resolution appropriate for assessing status/trends as well as operational decisions regarding compliance, effectiveness and adaptive management," AR7750. This information will include the number of participants and Certificates of Inclusion obtained, a description of the activities undertaken in lizard habitat, an update on the quantity and quality of the habitat, justification where exceptions were granted to the requirement to avoid lizard habitat, a description of the overall effectiveness of the Texas Plan, and instances of noncompliance and remedies. AR4512.

In sum, the FWS reasonably concluded that, even if it could not review each individual Certificate of Inclusion, it would have access to sufficient aggregate data "to ensure that all of the conservation measures are implemented as planned, and are effective at removing threats to the lizard and its habitat." 77 Fed. Reg. at 36,886.[18] Thus, the confidentiality of the Certificates of Inclusion does not render the FWS's reliance on the Texas Plan arbitrary and capricious.

**2. Because the FWS properly found that the conservation efforts' implementation and effectiveness were "sufficiently certain," the withdrawal decision complied with its PECE.**

Plaintiffs contend that in declining to list the lizard, the FWS failed to verify the "certainty" of various conservation efforts' implementation and effectiveness, as required by its own PECE.[19] 68 Fed. Reg. at 15,114; *see* Pls.' Mot. Summ. J. 28–32.[20] In response, Federal Defendants and Intervenor Defendants contend that the implementation and effectiveness of the conservation mechanisms were "*sufficiently* certain," as the Service found in its withdrawal

---

[18] Plaintiffs also claim that the Texas Plan is administered by the oil and gas industry. *See* Pls.' Mot. Summ. J. 10. This claim misapprehends the facts. The Texas Comptroller of Public Accounts—who holds the Texas Plan's ESA permit—contracted with Texas A&M University to administer the Plan. The University in turn assigned administrative functions to the Texas Habitat Conservation Foundation, whose Executive Director—at the time of the FWS's PECE analysis—was a former Texas Parks and Wildlife biologist. *See* AR7745. Although the Foundation was originally created by lobbyists for the Texas Oil and Gas Association, *see* Comptroller's Answer ¶¶ 36 & 37, this fact does not demonstrate that the FWS's reliance on the Texas Plan was arbitrary and capricious.

[19] Plaintiffs challenge not the facial validity of the PECE, but the "Service's application of its PECE policy to the lizard." Pls.' Reply Supp. Mot. Summ. J. 7 n.5; *see also* Pls.' Mot. Summ. J. 28 n.11. Because Plaintiffs do not facially challenge the PECE, the Court need not consider whether the PECE merits *Chevron* or *Skidmore* deference. Rather, the Court need only decide whether the FWS's application of the PECE was arbitrary and capricious, in violation of the APA and ESA.

Furthermore, the Court assumes (without deciding) that if the FWS were to violate its PECE, this violation would indeed constitute arbitrary and capricious agency action, as no party disputes this proposition advanced by Plaintiffs. *See* Pls.' Reply Supp. Mot. Summ. J. 7 (arguing that PECE violation is independent basis for finding arbitrary and capricious action).

[20] *See supra* notes 2, 3 (criteria for assessments of implementation and effectiveness).

decision. 68 Fed. Reg. at 15,115 (emphasis added); Fed. Defs.' Cross-Mot. Summ. J. 21–32; Comptroller's Cross-Mot. Summ. J. 35–39.

The Court concludes that the administrative record demonstrates that the FWS's withdrawal decision fully complied with its PECE. The FWS concluded that the New Mexico Agreement, Texas Plan, and BLM's RMPA "put in place conservation efforts *that have been implemented* by the States, BLM, private landowners, and oil and gas companies, and *have a high level of certainty of continuing to be implemented* in the future and *of being effective*." 77 Fed. Reg. at 36,898 (emphasis added). The Service supported this conclusion by assessing enrollment and compliance trends, the commitment and resources of participants, and monitoring and evaluation mechanisms.[21]

Plaintiffs contend that the FWS should not have credited the Texas Plan's commitment to capping overall habitat loss at 1% over the first three years of the Plan. AR7742. Plaintiffs contend that although this 1% goal might have been realistic if 99% of the Texas lizard habitat had been enrolled in the Plan, only 64–71% of the Texas acreage was enrolled at the time of the withdrawal decision. *See* Pls.' Mot. Summ. J. 27, 29. Furthermore, they contend that incentives for participation would only weaken after the withdrawal decision. *Id.* at 30. But the FWS reasonably expected participation in the Texas Plan to increase, based on its experience in New Mexico. *See* 77 Fed. Reg. at 36,886 ("The high level of participation and compliance with the New Mexico [Agreement] and additional voluntary conservation efforts prescribed by the Texas [Plan] supports our determination that similar enrollment, implementation, and success is [sic]

---

[21] As of the FWS's May 2012 PECE analysis, the New Mexico Agreement had an 83% enrollment rate and no incidence of non-compliance. *See* AR7739–40. And even though the Texas Plan had only become effective in February 2012, the FWS still analyzed that plan's implementation and effectiveness in its May 2012 PECE analysis and found that 71% of private landowners in Texas had already enrolled in the Texas Plan, and had already remitted $773,000 in participation fees. *See* AR7752.

likely to be achieved in Texas.").  In any event, the FWS further found that not every acre of the species' Texas habitat needed to be covered in order to meet the 1% target.[22]

Plaintiffs also claim in passing that the Service's inability to access the Certificates of Inclusion precludes finding any "certainty" in the Texas Plan's implementation or effectiveness.  *See* Pls.' Mot. Summ. J. 29.  For reasons discussed above, this claim is without merit.  *See supra* Part IV.C.1.  Similarly, Plaintiffs' contention that the adaptive management model is inapplicable in this context presumes incorrectly that the FWS has no access to "the data necessary to evaluate the effectiveness of conservation measures."  Pls.' Mot. Summ. J. 30.

Plaintiffs also misread *Alaska v. Lubchenco*, 825 F. Supp. 2d 209 (D.D.C. 2011), for the proposition that "PECE requires certainty that current conservation measures are *actually being implemented* and *effectively aiding the species*."  Pls.' Mot. Summ. J. 29 (emphasis added).  In that case, Alaska challenged the NMFS's decision to list the beluga whale as endangered.  In its motion for summary judgment, Alaska contended that the NMFS failed to consider the state's conservation efforts prior to making its listing decision, in violation of Section 4(b)(1)(A).  *See* 16 U.S.C. § 1533(b)(1)(A).  The court noted that the NMFS "considers a State's conservation efforts in accordance with its [PECE], which requires that current conservation efforts demonstrate some degree of certainty as to their 'implementation' and 'effectiveness.'" *Lubchenco*, 825 F. Supp. 2d at 219.  "In other words," the court explained, "it is not enough for the State to identify conservation efforts that *may* be beneficial to a species' preservation; those

---

[22] *See, e.g.*, AR7740 ("We are satisfied that the conservation efforts evaluated will be effective in reducing threats to the lizard; however, in order to do so they do not need to be applied on every acre of suitable lizard habitat.  For instance, not all of the mesquite encroaching on occupied dune complexes needs to be removed."); AR8334 ("Currently, greater than 50 percent of the dunes sagebrush lizard's habitat is unfragmented and provides large areas of core shinnery oak dunes.  These large core areas, along with the adaptive management provisions of the conservation agreements, will provide refugia to help maintain adequate habitat for the lizard with changing climactic conditions.").

efforts must actually be in place and have achieved some measure of success in order to count under the Service's [PECE] policy." *Id.* Applying these principles, the court reasoned that certain state efforts were not targeted specifically at beluga whales, while others were underfunded. *Id.* In denying Alaska's motion for summary judgment, the court ultimately agreed with the NMFS that conservation efforts "had not demonstrated a degree of effectiveness sufficient to alleviate concern" about the beluga whales. *Id.*

Consistent with the PECE, *Lubchenco* permits agencies to consider state programs that are not yet fully implemented or proven. The *Lubchenco* court understood that agencies may take into account preliminary "efforts" that meet with some early "success" in planning and preparation, *id.*, though conservation efforts at issue in that case "had not demonstrated a *degree of effectiveness* sufficient" to withhold listing. *Id.* (emphasis added).[23] Thus, the PECE, as explicated in *Lubchenco*, recognizes that implementation and effectiveness are often assessed in relative rather than absolute terms; when faced with regulatory uncertainty and risk to certain species, the Service can still chart a course of action, provided it assesses and controls for that uncertainty and risk.[24] Here, the FWS did just this, when confronted with the newly concluded Texas Plan.[25]

---

[23] To the extent that a footnote in *In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litigation* suggests that much more is required by the PECE, the Court does not find that dicta to be persuasive. *See* 794 F. Supp. 2d 65, 113 n.56 (D.D.C. 2011) ("[The PECE] requires that in making a listing determination FWS may only consider formalized conservation efforts that have been implemented and have been shown to be effective.").

[24] Because Plaintiffs do not challenge the PECE, they are mistaken in relying on pre-PECE cases that disallowed consideration of conservation efforts not yet fully implemented or effective. *See, e.g.*, *Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1154 (D. Or. 1998) ("[T]he Secretary may not rely on plans for future actions to reduce threats and protect a species as a basis for deciding that listing is not currently warranted."); *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex. 1997) ("The Secretary cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record.").

Having analyzed each factor required by its PECE, the FWS reasonably concluded that the New Mexico and Texas conservation measures were "sufficiently certain" to be implemented and effective. 77 Fed. Reg. at 36,882 (citing PECE); *see also* AR7720–7759 (PECE analyses). Accordingly, the Service's reliance on those measures complied fully with its PECE.[26]

## V. CONCLUSION

The FWS's withdrawal decision was neither arbitrary and capricious under the ESA and APA, nor contrary to ESA requirements governing listing decisions. The FWS examined the conservation measures in place and determined that they would be effective and would continue to eliminate threats to the lizard. Of course, if the measures prove ineffective, the FWS is free to revisit its decision and list the lizard as endangered.

For the foregoing reasons, Federal Defendants' and Intervenor Defendants' cross-motions for summary judgment are GRANTED, and Plaintiffs' motion for summary judgment is

---

Moreover, to the extent that the PECE's allowance of reliance on unrealized future efforts comes into tension with listing factor D's emphasis on "existing regulatory mechanisms," *see* 16 U.S.C. § 1533(a)(1)(D), this tension is found within the ESA itself, which also requires that listing decisions be based on assessments of "any" state conservation efforts, *see id.* § 1533(b)(1)(A). The parties do not ask this Court to resolve this tension, and it suffices to observe that the ESA's listing factor D and section 4(b)(1)(A) impose "separate . . . but similar" obligations, which give rise to distinct inquiries. *Lubchenco*, 825 F. Supp. 2d at 219.

[25] In contrast to the Texas Plan, the New Mexico Agreement had been in place since 2008 and had a "documented track record" of compliance. AR8294. Plaintiffs thus focus their PECE challenge on the much newer Texas Plan.

[26] In its motion for summary judgment, Plaintiffs appeared to take issue with the voluntary nature of the conservation efforts cited by the FWS. *See* Pls.' Mot. Summ. J. 20 ("Because the [New Mexico and Texas] Agreements are voluntary, the Service unreasonably relied upon them in withdrawing the Proposed Rule."). However, in reply, Plaintiffs conceded that "the issue is not whether the Service may consider voluntary conservation efforts," but rather the unproven and speculative nature of the particular efforts at issue here. *See* Pls.' Reply Supp. Mot. Summ. J. 3–4. As explained above, the Court rejects Plaintiffs' contention that the conservation efforts here were too speculative to support the withdrawal decision.

DENIED.  An Order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  September 30, 2014                                  RUDOLPH CONTRERAS
                                                           United States District Judge